UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION


JOHN SHULICK,

                    Petitioner,                              Hon. Paul L. Maloney

v.                                                       Case No. 1:07-CV-1286

MARY BERGHUIS,

                    Respondent.

_____/


## REPORT AND RECOMMENDATION

        This matter is before the Court on Shulick's petition for writ of habeas corpus. In accordance with 28 U.S.C. § 636(b) authorizing United States Magistrate Judges to submit proposed findings of fact and recommendations for disposition of prisoner petitions, the undersigned recommends that Shulick's petition be **denied**.


## BACKGROUND

        As a result of events that occurred on September 23, 2002, Petitioner was charged with: (1) assault with the intent to inflict great bodily harm less than murder; (2) assaulting a police officer causing injury; and (3) possessing a firearm during the commission of a felony. Several individuals testified at Petitioner's jury trial. The relevant portions of their testimony are summarized below.

**Mark Muniak**

On May 15, 2002, a judgment of divorce was entered terminating the marriage between Petitioner and Barbara Shulick. (Trial Transcript, February 3, 2003, 189-93; Trial Transcript, February 4, 2003, 144-45). One of the terms of the divorce was that Barbara Shulick was awarded the residence provided she purchase Petitioner's interest therein by August 15, 2002. (Trial Transcript, February 3, 2003, 192-95). Muniak, an attorney, represented Barbara Shulick in this matter. (Tr. 189-94).

Shulick secured the necessary financing and on August 9, 2002, Muniak attended a court hearing at which he intended to deliver the proceeds to Petitioner. (Tr. 194-97). However, when Muniak attempted, in court, to complete the transaction, Petitioner "removed his shoes and started banging them together" and began "shouting" that "the court didn't have authority over him." (Tr. 197-200). Petitioner refused to accept payment. (Tr. 200). He also indicated that "any attempt to get him to vacate the premises will result in. . .blood on the walls." (Tr. 210-11). On September 13, 2002, Muniak obtained a court order authorizing the Charlevoix County Sheriff's Department to enter and physically remove Petitioner from the residence. (Tr. 201-11). Muniak requested that the Sheriff's Department serve the order. (Tr. 202-04).

**Sheriff George Lasater**

As of September 23, 2002, Lasater was serving as Sheriff of Charlevoix County. (Trial Transcript, February 4, 2003, 49-50). At approximately 6:30 a.m. that morning, Lasater met with the undersheriff and two deputies "to make preparations to enforce a court order from the Circuit Court" directing Petitioner to vacate his residence. (Tr. 50-52). Sheriff Lasater instructed

that Petitioner "was to be given an opportunity to leave, and if he didn't leave, he would be escorted from that residence by the Sheriff's office." (Tr. 52). Lasater instructed the deputies to secure the outside of the residence, in case Petitioner attempted to avoid service, while he and the undersheriff approached the front door. (Tr. 53). While Lasater had encountered Petitioner previously, finding him to be "verbally abusive" and a "bully," he did not expect the current assignment to result in a physical confrontation. (Tr. 66-67).

Upon arriving at the residence, Sheriff Lasater encountered Barbara Shulick, who informed Lasater that Petitioner was in the upstairs portion of the house. (Tr. 55-57). As Sheriff Lasater began walking up the stairs, Petitioner appeared brandishing what appeared to be "a large gauge shotgun." (Tr. 58). Petitioner pointed the weapon approximately 18-24 inches from Lasater's face and stated, "drop it or I'll blow your head off." (Tr. 58). Sheriff Lasater testified that, "I was convinced that based upon [Petitioner's] demeanor, his voice, his aggressiveness, that if I made a move, that he would shoot me." (Tr. 74). Lasater did not move, but instead simply informed Petitioner, "I'm just here to serve you some papers." (Tr. 74). Lasater then fell "backwards down the steps. . .[and] hit the landing wall." (Tr. 58). Sheriff Lasater was "out for a few seconds" and then realized that his upper and lower front teeth were "missing" and his "upper lip was dangling by a - by a piece of skin." (Tr. 58-59).

**Barbara Shulick**

On May 15, 2002, the divorce between Shulick and Petitioner became final. (Trial Transcript, February 4, 2003, 144-46). Shulick subsequently borrowed the money to purchase Petitioner's interest in their house. (Tr. 151). Petitioner, however, refused to accept this money.

(Tr. 151-52). Petitioner also refused to leave the residence, despite "several" requests to do so. (Tr. 146-50). Petitioner indicated that "he felt it was his home and he didn't think he should leave." (Tr. 171). Petitioner stated that "he wasn't going to leave on his own accord and if forced into some sort of confrontation, it would result in 'blood on the walls' and 'stacked bodies.'" (Tr. 150-51).

With the assistance of Mark Muniak, Shulick was able to obtain a court order for the removal of Petitioner from her residence. (Tr. 148-49). Petitioner was able on "several" occasions to avoid being served with this court order. (Tr. 152-53). At approximately 7:00 a.m. on September 23, 2002, police officers arrived at Shulick's residence to serve Petitioner with the order directing him to leave the residence. (Tr. 160-65). After observing the taillights of the police vehicles, Petitioner stated, "it's the cops" and "went upstairs." (Tr. 162). Shulick invited the officers inside. (Tr. 165). The lighting in the house was such that Shulick experienced no difficulty identifying her visitor as Sheriff Lasater. (Tr. 165-66). Shulick informed the Sheriff that Petitioner was upstairs, at which point Lasater "went to the back stairway." (Tr. 166).


**Dr. Edward Newcomb**

On the morning of September 23, 2002, Dr. Newcomb was on duty in the Charlevoix Area Hospital emergency room when Sheriff Lasater arrived. (Trial Transcript, February 5, 2003, 38-39). An examination revealed that Lasater had suffered a "large laceration to his upper lip. . .two loose teeth on the bottom and missing teeth out of the front of his upper mouth." (Tr. 41). Sheriff Lasater reported that he "had been struck in the mouth by a gun." (Tr. 39-40). Dr. Newcomb reported that Lasater's injuries were consistent "with having the barrel end of a sawed-off shotgun rammed into his face." (Tr. 42). The doctor further reported that Sheriff Lasater's injuries were

"not consistent" with "falling down the stairs and hitting your face." (Tr. 42).

## Undersheriff William Schneider

As of September 23, 2002, Schneider was employed as the Charlevoix County Undersheriff. (Trial Transcript, February 5, 2003, 48-49). At approximately 6:30 a.m. that morning, Schneider met with Sheriff Lasater and two deputies in preparation for serving certain papers on Petitioner. (Tr. 48-50). Shortly thereafter, the four officers proceeded to Barbara Shulick's residence. (Tr. 50-51). Upon their arrival, Undersheriff Schneider and Sheriff Lasater "proceeded to the front door of the residence." (Tr. 51). After entering the residence, Barabra Shulick informed the officers that Petitioner was upstairs. (Tr. 52-53).

As Schneider "went to turn up the stairs," he "froze because John Shulick had a 12-gauge shotgun pointed directly at the sheriff's head." (Tr. 54-55). Neither Schneider nor Lasater had their weapons drawn. (Tr. 55-57). Sheriff Lasater informed Petitioner, "I've just got paperwork for you." (Tr. 55). Petitioner immediately took another step down the stairs and "jabbed" his weapon at the Sheriff, who then "fell down the steps." (Tr. 55-57). Schneider immediately assumed a protective position while the two deputies attended to the Sheriff. (Tr. 57-60). Petitioner escaped the residence via a second stairway, but was captured approximately 31 hours later. (Tr. 55-65).

## Deputy George Lasater

As of September 23, 2002, Lasater was employed as a Charlevoix County Deputy Sheriff. (Trial Transcript, February 5, 2003, 126-27). Shortly after 6:30 a.m. that morning, Lasater accompanied the Sheriff, the Undersheriff, and Deputy Brian VanMeter to Barbara Shulick's

residence "to serve John Shulick a court ordered eviction notice." (Tr. 128). As he approached the residence, Deputy Lasater observed an individual "quickly going through the, uh, the kitchen area and the living room area and shutting off lights." (Tr. 129-32). After arriving at the residence, Lasater helped secure the exterior of the house as he had been instructed. (Tr. 132).

Soon thereafter, Deputy Lasater heard "a man yelling that sounded like the yelling was coming from the upstairs area of the home." (Tr. 133). Lasater then entered the house and observed the Sheriff "face down on the floor." (Tr. 133). Undersheriff Schneider informed Lasater that "John Shulick hit the sheriff in the face with the barrel of a shotgun." (Tr. 136).


**Deputy Brian VanMeter**

As of September 23, 2002, VanMeter was employed as a Charlevoix County Deputy Sheriff. (Trial Transcript, February 5, 2003, 173-74). Shortly before 7:00 a.m. that morning, VanMeter accompanied Sheriff Lasater, Undersheriff Schneider, and Deputy Lasater to Barbara Shulick's residence. (Tr. 174-76). Deputy VanMeter was instructed to help secure the exterior of the house while the Sheriff and Undersheriff entered the residence. (Tr. 175). As he approached the residence, VanMeter observed a man "quickly moving through the house, turning off lights behind himself." (Tr. 176-77).

Upon their arrival, the Sheriff and Undersheriff entered the residence while Deputies VanMeter and Lasater remained outside. (Tr. 177-79). Soon thereafter, VanMeter entered the house and heard "shouting" coming from the kitchen area. (Tr. 179-80). Deputy VanMeter winessed the Sheriff "c[o]me down the steps rather abruptly and land[] on his face." (Tr. 180). Undersheriff Schneider informed VanMeter that the Sheriff had been "assaulted by Shulick with a shotgun." (Tr.

180-81).  After calling for backup assistance and an ambulance, Deputy VanMeter helped the Sheriff outside.  (Tr. 182).

**Steven Hickman**

Hickman, a firearms examiner with the Michigan State Police, examined the shotgun that Petitioner used to assault Sheriff Lasater and found that it "functioned properly."  (Trial Transcript, February 5, 2003, 202-06).

**Jennifer Patchin**

Patchin, a forensic scientist with the Michigan State Police, examined the shotgun that Petitioner used to assault Sheriff Lasater, finding no evidence of blood or saliva.  (Trial Transcript, February 5, 2003, 210-13).  Patchin indicated, however, that because the gun barrel was a smooth, non-porous surface this was neither surprising nor inconsistent with Petitioner having "thrust" the weapon into somebody's face.  (Tr. 213-16).

**Timothy Shulick**

Timothy Shulick is Petitioner's son.  (Trial Transcript, February 5, 2003, 221-22).  Shulick was present at his mother's residence on the morning of September 23, 2002.  (Tr. 222).  At some point that morning, Shulick decided to go outside for a walk.  (Tr. 223-27).  As he opened the door to go outside, he observed a vehicle approaching the house.  (Tr. 227).  Shulick immediately "yelled out" that a car was approaching.  (Tr. 227-28).  He then turned off the kitchen light and went upstairs.  (Tr. 227-29).  Shortly thereafter, Shulick heard Petitioner "shout, 'don't

move.'"  (Tr. 241).

**James Carrow**

As of September 24, 2002, Carrow lived in the same general vicinity as Barbara Shulick. (Trial Transcript, February 6, 2003, 10-12). Late that afternoon, Carrow entered his boat to begin "winterizing it." (Tr. 12-13). As he "walked down into the galley," Carrow encountered Petitioner. (Tr. 13). Carrow also observed "a shotgun laying in the back of the cabin in the bed area and a band of shotgun shells." (Tr. 14). As they discussed the events of the previous day, Petitioner acknowledged "hitting somebody," but claimed that "he didn't know who it was that he had hit." (14-16). Petitioner then asked Carrow if he "could stay in the boat." (Tr. 16). Carrow declined and instead persuaded Petitioner to effect a "peaceful surrender," at which point Petitioner gave his shotgun to Carrow. (Tr. 16). Carrow further testified that, based on recent conversations, Petitioner was aware that the "Sheriff's Department was trying to serve papers on him." (Tr. 19-20).

**Deputy Rex Stark-Behling**

In October 2001, Stark-Behling, a Charlevoix County Deputy Sheriff, began investigating a complaint from Petitioner that his thirteen year-old daughter, C.S., had engaged in sex with several older boys. (Trial Transcript, February 6, 2003, 54-55, 86). The investigation eventually implicated the son of another Deputy, at which point the matter was turned over to the Michigan State Police. (Tr. 56-59).

As part of Stark-Behling's investigation, Petitioner provided a copy of a letter in which C.S. allegedly acknowledged having sex with three individuals. (Tr. 55). However, portions of the copy Petitioner provided had been "blackened out." (Tr. 60). Deputy Stark-Behling "wanted to see what else was also in that letter, to see why there would be portions of it blacked out." (Tr.

60).  To facilitate such, Petitioner was served with a subpoena ordering him to produce the complete (unedited) letter.  (Tr. 61).  Petitioner did not comply with the subpoena.  (Tr. 61-62).  Deputy Stark-Behling testified that "on a scale of 1-10, with ten being a high level of cooperation, one being a low level," Petitioner's level of cooperation in his investigation into the allegations involving C.S. was "around a four."  (Tr. 61-62).

**Trooper Michael Sysko**

As of September 24, 2002, Sysko was employed as a Michigan State Trooper.  (Trial Transcript, February 6, 2003, 93).  On that date, Trooper Sysko was dispatched to Barbara Shulick's residence to collect evidence and photograph the crime scene.  (Tr. 93).  An examination of the stairway revealed blood "from the fourth stair down to the ground."  (Tr. 95).  Trooper Sysko observed a "large amount of blood" in the kitchen area, including a "bloody towel" and "a drag mark approximately four feet" in length.  (Tr. 95-96).

**Trooper Douglas Sundmacher**

On September 24, 2002, Sundmacher, a Michigan State Trooper, was dispatched to Barbara Shulick's residence to assist Trooper Sysko collect evidence.  (Trial Transcript, February 6, 2003, 112-13).  During this visit, Trooper Sundmacher observed that "not many" of the lights inside the residence were working.  (Tr. 117-18).  On January 10, 2003, Trooper Sundmacher returned to the Shulick residence to take measurements so that he could produce a scale drawing of the interior and exterior of the residence.  (Tr. 113).

**Detective-Sergeant White-Erickson**

White-Erickson, a Detective-Sergeant with the Michigan State Police, interviewed Barbara Shulick on September 23, 2002, following Petitioner's assault of Sheriff Lasater. (Trial Transcript, February 6, 2003, 129-30). Shulick was "shaken and a little bit nervous and upset," but was nonetheless "very cooperative." (Tr. 130). The following day, White-Erickson interviewed Timothy Shulick, who "was not" cooperative. (Tr. 131-32). Detective-Sergeant White-Erickson later participated in Petitioner's arrest at Jim Carrow's residence. (Tr. 134).

**Deputy Donald Sproul**

On the morning of September 24, 2002, Charlevoix County Deputy Sheriff Donald Sproul was dispatched "to the area of the Shulick residence" to assist in the effort to locate Petitioner. (Trial Transcript, February 6, 2003, 140-41). Later than afternoon, Deputy Sproul was dispatched to Barabra Shulick's residence to assist in the collection of evidence. (Tr. 141-57).

**Dale Hutzler**

Hutzler employed Petitioner "on and off" during the seven summers preceding Petitioner's assault of Sheriff Lasater. (Trial Transcript, February 6, 2003, 163-64). Hutzler testified that he trusted Petitioner and never heard him use profanity or act in a threatening manner. (Tr. 165).

**John Shulick**

Petitioner testified that on September 23, 2002, at approximately 6:15 a.m., he

returned to Barbara Shulick's residence after visiting his parents. (Trial Transcript, February 6, 2003, 212-14, 223). Barbara Shulick was sitting on the couch drinking coffee when he arrived. (Tr. 216). Petitioner joined her and asked whether Barbara had "talked to her attorney" or "talked to the police." (Tr. 221). Barbara Shulick responded, "no, everything's been really quiet." (Tr. 221). After bringing his belongings inside, Petitioner went upstairs and fell asleep. (Tr. 221-23).

Petitioner later awoke to the sound of "loud footfalls" that "sounded like there was an army in [the] house." (Tr. 223-24). Petitioner "jumped out of bed" and then "reached under the bed and. . .pulled out [his] shotgun and [his] band of bullets." (Tr. 224). Petitioner then "stepped out of the bedroom" where he observed "light coming up the steps." (Tr. 225). Petitioner then turned toward the stairs and "shouldered the shotgun and. . .hollered out, 'hold it right there.'" (Tr. 225). When Petitioner turned to look down the stairs all he saw was a "bright light" shining in his face. (Tr. 226). Petitioner then "screamed, drop the light." (Tr. 226). When there was no reaction, Petitioner screamed this command again. (Tr. 226).

Petitioner testified that he "saw a man. . .with a gun in his hand." (Tr. 227). Petitioner then "pulled the shotgun over on him, and he jumped back." (Tr. 227). The man then fell "down the steps." (Tr. 227-28). Petitioner was unsure if he hit the man in the face, but he knew that "there was contact made." (Tr. 228). After the man fell down the stairs, he heard a voice say, "Officer down. Gunshot wound." (Tr. 228). Petitioner then "freaked out" and escaped down the back steps and "ran up in the woods." (Tr. 228). Petitioner did not hear the man (or anybody else) say anything to him. (Tr. 226, 237). Petitioner also did not know that the man was a police officer. (Tr. 229). Petitioner testified that the lighting in the residence, and in the stairwell in particular, was poor. (Tr. 231-33).

On cross-examination, Petitioner asserted that he had done nothing wrong and was the victim of a "vengeful, lying woman" and an "overzealous" and "biased" Sheriff's Department. (Trial Transcript, February 7, 2003, 3-4). When asked if he felt "any remorse for what happened to the sheriff," Petitioner responded "I feel bad that the sheriff fell down the steps." (Tr. 54).

Following the presentation of evidence, the jury found Petitioner guilty of: (1) assault with the intent to inflict great bodily harm less than murder; (2) assaulting a police officer causing injury; and (3) possessing a firearm during the commission of a felony. (Trial Transcript, February 10, 2003, 5-6). Petitioner was sentenced to serve two years in prison for the firearms violation, 2-4 years for assaulting a police officer causing injury, and 5-10 years for the assault with the intent to inflict great bodily harm less than murder conviction, all three sentences to be served consecutively. (Sentence Transcript, February 28, 2003, 45-46). Petitioner appealed his convictions in the Michigan Court of Appeals, asserting the following claims:

I.     The Defendant was denied his right to a fair trial when the trial judge abused his discretion and refused to disqualify himself pursuant to MCR 2.003 when he was personally biased and prejudiced against the Defendant even prior to his criminal trial.

II.    It was reversible error when the prosecutor in closing argument improperly shifted the burden of proof to Defendant when she argued that the defense had to fulfill "promises" made in opening by defense counsel and imply the Defendant had to answer or disprove damaging evidence against him.

III.   When the trial court sentenced the Defendant to upward departures on his convictions of assault with intent to commit great bodily harm and resisting and opposing a police officer causing injury and also ordered the sentences to run consecutive to one another the trial court abused its discretion especially since the Defendant had no prior adult or juvenile

record of either misdemeanors or felonies.

The Michigan Court of Appeals affirmed Petitioner's conviction. *People v. Shulick,* 2004 WL 2050156 (Mich. Ct. App., Sept. 14, 2004). Asserting the same claims, Petitioner moved in the Michigan Supreme Court for leave to appeal. The court denied Petitioner's request, stating that "we are not persuaded that the questions presented should be reviewed by this Court." *People v. Shulick,* 697 N.W.2d 154 (Mich., May 31, 2005).

Petitioner subsequently filed in the trial court a motion for relief from judgment in which he asserted the following claims:

I.      Defendant is entitled to a new trial based upon newly discovered evidence, where the prosecution's witness recanted testimony which was the result of prosecutorial misconduct of coercion, perjury, and threats, and the prosecutor failed to correct the witness' perjured testimony, denied Defendant a fair trial and that Defendant is innocent of the charges, an evidentiary hearing is needed.

II.     Defendant was denied due process and both State and Federal Constitutional right to effective assistance of counsel, where appellate counsel's failure to raise on direct appeal, trial counsel was ineffective for the failure to produce expert witness for service of process, and Defendant requests an evidentiary hearing.

III.    Defendant was denied due process, and both State and Federal Constitutional rights, to cross-examine, and impeach witnesses as part of his defense, where the trial court abused its discretion, when it failed to allow the Defendant's character witnesses to testify to the sheriff's truthfulness as to the credibility of the crime charged, in violation of Defendant's right to a fair trial.

IV.    Defendant was denied both State and Federal Constitutional rights to the effective assistance of trial

counsel when trial counsel failed to provide the pertinent portions of the letter from the Defendant, dated 2/16/02, and the whole letter dated 5/14/02, that were sent to the trial judge, and counsel's failure to provide the information to the motion to disqualify the trial judge prejudiced Defendant.

The trial court denied Petitioner's motion. *People v. Shulick*, No. 02-730-09-FH, Opinion (Charlevoix Cnty. Cir. Ct., Oct. 27, 2006). Petitioner then moved in the Michigan Court of Appeals for leave to appeal, asserting the following claims:

I. Defendant-Appellant was denied his constitutional right to procedural due process and equal protection of the laws when the court abused its discretion by refusing to take judicial adjudicative notice of fact and law as formally requested by the party before it; thereby permitting the statutory language of MCL § 49.160(2) which specifically expresses the legislatively imposed pro-quer duties of the Attorney General and exposes non-compliance, rendering the court's retrieval of subject-matter jurisdiction radically defective.

II. Defendant-Appellant was denied an evidentiary hearing when the court accepted an improper, unsworn, hearsay, out-of-court statement as impeachment and substantive evidence, thereby violating the Defendant's due process, and both State and Federal constitutional rights to confrontation.

III. Defendant-Appellant was denied an evidentiary hearing to develop the record of an "off-the-record bench conference," where affidavits and trial transcripts affirm that the judge plainly erred when he stated that "the court's position was entirely on the record" in an attempt to explain away the record's silence as the trial attorney's sound trial strategy rather than ineffective assistance of both trial and appellate counsels.

IV. Defendant-Appellant was denied due process, and both State and Federal constitutional rights to cross-

examine, and impeach witnesses as part of his defense, where the court conceded that "the court's ruling could have been reviewed by the Court of Appeals" but refused to acknowledge the Defendant's submitted "cause and actual prejudice" argument for consideration and appellate counsel's ineffective assistance for failing to raise this issue on appeal of right.

V. Defendant-Appellant was denied both State and Federal constitutional rights to the effective assistance of trial counsel, when the court refused to acknowledge for judicial review the pretermitted portions of a letter, and the complete avoidance of another which irrefutably demonstrates trial counsel's ineffectiveness for failing to enter crucial inflammatory correspondence which was pertinent for the justiciable recusal of the trial judge.

Petitioner's request was denied "for failure to meet the burden of establishing entitlement to relief under MCR 6.508(D)." *People v. Shulick*, No. 275793, Order (Mich. Ct. App., June 18, 2007). Asserting the following issues, Petitioner moved in the Michigan Supreme Court for leave to appeal:

I. Defendant-Appellant was denied his constitutional right to procedural due process and equal protection of the laws when the court abused its discretion by refusing to take judicial adjudicative notice of fact and law as formally requested by the party before it; thereby permitting the statutory language of MCL § 49.160(2) which specifically expresses the legislatively imposed pro-quer duties of the Attorney General and exposes non-compliance, rendering the court's retrieval of subject-matter jurisdiction radically defective.

II. Defendant-Appellant was denied an evidentiary hearing when the court accepted an improper, unsworn, hearsay, out-of-court statement as impeachment and substantive evidence, thereby violating the Defendant's due process, and both State

16

and Federal constitutional rights to confrontation.

III. Defendant-Appellant was denied an evidentiary hearing to develop the record of an "off-the-record bench conference," where affidavits and trial transcripts affirm that the judge plainly erred when he stated that "the court's position was entirely on the record" in an attempt to explain away the record's silence as the trial attorney's sound trial strategy rather than ineffective assistance of both trial and appellate counsels.

IV. Defendant-Appellant was denied due process, and both State and Federal constitutional rights to cross-examine, and impeach witnesses as part of his defense, where the court conceded that "the court's ruling could have been reviewed by the Court of Appeals" but refused to acknowledge the Defendant's submitted "cause and actual prejudice" argument for consideration and appellate counsel's ineffective assistance for failing to raise this issue on appeal of right.

V. Defendant-Appellant was denied both State and Federal constitutional rights to the effective assistance of trial counsel, when the court refused to acknowledge for judicial review the pretermitted portions of a letter, and the complete avoidance of another which irrefutably demonstrates trial counsel's ineffectiveness for failing to enter crucial inflammatory correspondence which was pertinent for the justiciable recusal of the trial judge.

VI. Defendant-Appellant was erroneously denied entitlement to relief when the Court of Appeals erred though the unreasonable application of a legal standard on which their decision or order was based; and thereby committed reversible error.

VII. Defendant-Appellant invokes his Michigan State constitutionally provided right for application for Writ of Error apparent on the face of the record, where the respondents erred by refusing to take judicial notice of statutory questions of law

intrinsically accessible in the annuls of the Michigan Supreme Court of last state judicial resort.

The court denied Petitioner's request because he "failed to meet the burden of establishing entitlement to relief under MCR 6.508(D)." *People v. Shulick*, 134555, Order (Mich., Nov. 29, 2007). On December 26, 2007, Petitioner initiated the present action in which he asserts the following claims:

I. Judge bias; actual bias, violation of due process right to a fair trial.

II. Factual actual innocence; recantation testimony; newly discovered evidence.

III. Ineffective assistance of both trial and appellate counsels.

IV. Violation of Confrontation Clause.

V. Ineffective assistance of trial counsel.

VI. Constitutional challenge of state statute.

VII. Confrontation Clause.

VIII. Ineffective assistance of counsels.

IX. Deprivation of Sixth Amendment right to cross-examine and impeach witnesses.

X. Deprivation of U.S. Constitutionally vested liberty interest and due process by ineffective assistance of trial counsel.

# STANDARD OF REVIEW

Shulick's petition is subject to the provisions of the Antiterrorism and Effective Death Penalty Act (AEDPA), as it amended 28 U.S.C. § 2254. The AEDPA amended the substantive standards for granting habeas relief under the following provisions:

>  (d)  An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim —
>
> (1)  resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States, or
>
> (2)  resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d).

The AEDPA has "modified" the role of the federal courts in habeas proceedings to "prevent federal habeas 'retrials' and to ensure that state-court convictions are given effect to the extent possible under law." *Bell v. Cone*, 535 U.S. 685, 693 (2002).

Pursuant to § 2254(d)(1), a decision is "contrary to" clearly established federal law when "the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law or if the state court decides a case differently than [the Supreme] Court has on a set of materially indistinguishable facts." *Williams v. Taylor*, 529 U.S. 362, 412-13 (2000); *see also, Lancaster v. Adams*, 324 F.3d 423, 429 (6th Cir. 2003).

Prior to *Williams*, the Sixth Circuit interpreted the "unreasonable application" clause of § 2254(d)(1) as precluding habeas relief unless the state court's decision was "so clearly incorrect

that it would not be debatable among reasonable jurists." *Gordon v. Kelly*, 2000 WL 145144 at *4 (6th Cir., February 1, 2000); *see also*, *Blanton v. Elo*, 186 F.3d 712, 714-15 (6th Cir. 1999). The *Williams* Court rejected this standard, indicating that it improperly transformed the "unreasonable application" examination into a subjective inquiry turning on whether "at least one of the Nation's jurists has applied the relevant federal law in the same manner" as did the state court. *Williams*, 529 U.S. at 409.

In articulating the proper standard, the Court held that a writ may not issue simply because the reviewing court "concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly." *Williams,*529 U.S. at 411. Rather, the Court must also find the state court's application thereof to be *objectively* unreasonable. *Bell*, 535 U.S. at 694; *Williams*, 529 U.S. at 409-12. Accordingly, a state court unreasonably applies clearly established federal law if it "identifies the correct governing legal rule from [the Supreme] Court's cases but unreasonably applies it to the facts of the particular. . .case" or "if the state court either unreasonably extends a legal principle from [the Supreme Court's] precedent to a new context where it should not apply or unreasonably refuses to extend that principle to a new context where it should apply." *Lancaster*, 324 F.3d at 429 (quoting *Williams*, 529 U.S. at 407).

Furthermore, for a writ to issue, the Court must find a violation of Supreme Court authority. The Court cannot look to lower federal court decisions in determining whether the relevant state court decision was contrary to, or involved an unreasonable application of, clearly established Federal law. *See Harris v. Stovall*, 212 F.3d 940, 943-44 (6th Cir. 2000).

Pursuant to 28 U.S.C. § 2254(d)(2), when reviewing whether the decision of the state

court was based on an unreasonable determination of the facts in light of the evidence presented, the factual findings of the state court are presumed to be correct. *See Warren v. Smith*, 161 F.3d 358, 360 (6th Cir. 1998) (citing 28 U.S.C. § 2254(e)(1)). Petitioner can rebut this presumption only by clear and convincing evidence. *Id.*

In certain circumstances, however, the deferential standard articulated above does not apply. First, if the state court resolves a particular claim but fails to articulate its analysis, the Court must apply "modified AEDPA deference." *Vasquez v. Jones*, 496 F.3d 564, 569-70 (6th Cir. 2007). Under this standard, "the court conducts a 'careful' and 'independent' review of the record and applicable law, but cannot reverse 'unless the state court's decision is contrary to or an unreasonable application of federal law.'" *Id.* at 570. However, where the state court has altogether failed to review a particular claim, such is reviewed de novo. As the Sixth Circuit has indicated, where the state court clearly did not address the merits of a claim, "there are simply no results, let alone reasoning, to which [the] court can defer." *McKenzie v. Smith*, 326 F.3d 721, 727 (6th Cir. 2003). In such circumstances, the court conducts a *de novo* review. *Id.*; *see also Wiggins v. Smith*, 539 U.S. 510, 533-35 (2003) (reviewing habeas issue *de novo* where state courts had not reached the question); *Maples v. Stegall*, 340 F.3d 433, 437 (6th Cir. 2003) (recognizing that *Wiggins* established *de novo* standard of review for any claim that was not addressed by the state courts).

## ANALYSIS

I.      **Judicial Bias**  (Habeas Claim I)

Prior to trial, Petitioner moved to disqualify the judge assigned to preside over his trial, the Honorable Richard Pajtas. Petitioner asserted that disqualification was appropriate because

Judge Pajtas had previously presided over Petitioner's divorce from Barbara Shulick, as well as a criminal matter involving one of Petitioner's sons. Petitioner asserted that during these previous proceedings, "much discord" developed between himself and the judge. Judge Pajtas denied Petitioner's motion. This decision was subsequently affirmed by a second judge. Petitioner now seeks habeas relief on the ground that the trial judge exhibited actual bias against him thereby violating his right to a fair trial.

The Fourteenth Amendment to the United States Constitution guarantees to every criminal defendant the right to a "fair trial in a fair tribunal before a judge with no actual bias against the defendant." *Lyell v. Renico*, 470 F.3d 1177, 1186 (6th Cir. 2006) (quoting *Bracy v. Gramley*, 520 U.S. 899, 904-05 (1997)). To prevail on his claim of judicial bias, Petitioner must demonstrate that the trial judge exhibited conduct "so extreme as to display clear inability to render fair judgment." *Lyell*, 470 F.3d at 1186-87 (quoting *Liteky v. United States*, 510 U.S. 540, 551 (1994)).

As the Supreme Court has observed, however, "judicial rulings alone almost never constitute a valid basis for a bias or partiality motion." *Liteky*, 510 U.S. at 555. Furthermore, "opinions formed by the judge on the basis of facts introduced or events occurring in the course of the current proceedings, *or of prior proceedings*, do not constitute a basis for a bias or partiality motion unless they display a deep-seated favoritism or antagonism that would make fair judgment impossible." *Id.* (emphasis added).

Petitioner has not identified any behavior or comments by the trial judge that even hint at the possibility that he was biased or prejudiced against Petitioner. The Michigan Court of Appeals rejected this claim, observing that Petitioner "has presented only evidence that *he* had a bias against the *judge*, not that the *judge* was biased against *him*." *Shulick*, 2004 WL 2050156 at *4-5

(emphasis in original). The rejection of this claim by the Michigan Court of Appeals is neither contrary to, nor involves an unreasonable application of, clearly established federal law. Furthermore, it was not based on an unreasonable determination of the facts in light of the evidence presented. Accordingly, this claim raises no issue upon which habeas relief may be granted.

**II.**　　　**Procedurally Defaulted Claims** (Habeas Claims III-V, VII-X)

In these claims, Petitioner asserts various theories that his conviction violates his constitutional rights. In claims III, V, VIII, and X, Petitioner asserts that he was denied the right to the effective assistance of both trial and appellate counsel. In claims IV, VII, and IX, Petitioner asserts that he was denied the right to confront and cross-examine the witnesses against him.

Petitioner did not pursue these claims on direct appeal in the state courts, but instead pursued them initially in his post-conviction motions for review. Finding that Petitioner had failed to comply with relevant state procedure, the Michigan Supreme Court declined to address the merits of these particular claims. Respondent asserts that this Court is likewise barred, by the procedural default doctrine, from addressing the merits of these particular claims.

Under the procedural default doctrine, federal habeas review is barred where a state court declined to address Petitioner's claims because of a failure to satisfy state procedural requirements. *See Coleman v. Thompson*, 501 U.S. 722, 729-30 (1991). Where Petitioner's claims have been procedurally defaulted, the state court judgment rests on an independent and adequate state ground precluding review by a federal court. *See Coleman*, 501 U.S. at 750-51; *Wainwright v. Sykes*, 433 U.S. 72, 81 (1977); *Harris v. Reed*, 489 U.S. 255, 262 (1989).

The Sixth Circuit employs a multi-part test to determine if a petitioner has

procedurally defaulted a particular issue: (1) there must exist a state procedural rule that is applicable to the claim and with which the petitioner failed to comply, (2) the state court must have actually enforced the state procedural rule, and (3) the default must constitute an "independent and adequate" state ground on which the state can rely to foreclose review of a federal constitutional claim. *See Williams v. Bagley*, 380 F.3d 932, 966 (6th Cir. 2004). For the procedural default doctrine to apply, "the last state court rendering a judgment in the case must have based its judgment on the procedural default." *Simpson v. Jones*, 238 F.3d 399, 406 (6th Cir. 2000). However, review by a state court of a procedurally defaulted claim to prevent manifest injustice does not constitute a review on the merits sufficient to excuse procedural default. *See Lundgren v. Mitchell*, 440 F.3d 754, 765 (6th Cir. 2006) ("a state court's plain error analysis does not save a petitioner from procedural default").

If Petitioner has procedurally defaulted a particular claim, federal habeas review is available only if he can establish either (1) the existence of cause for his default and actual prejudice resulting therefrom, or (2) that the failure to consider the merits of the claim will result in a fundamental miscarriage of justice. *See Bagley*, 380 F.3d at 966 (citing *Coleman*, 501 U.S. at 750).

With respect to cause, Petitioner must demonstrate the existence of some objective factor, external to the defense, which impeded his efforts to comply with the applicable procedural rule. *See Murray v. Carrier*, 477 U.S. 478, 488 (1986); *Johnson v. Wilson*, 187 Fed. Appx. 455, 458 (6th Cir., June 16, 2006). To establish that a miscarriage of justice would result from the failure to review his procedurally defaulted claims, Petitioner must make a "colorable showing of factual innocence." *McCleskey v. Zant*, 499 U.S. 467, 495 (1991). To satisfy this requirement Petitioner must demonstrate the existence of new and reliable evidence, not presented at trial, which

establishes that some constitutional error "probably resulted" in the conviction of an innocent person. *See Schlup v. Delo*, 513 U.S. 298, 324-27 (1995). The evidence must show that it is "more likely than not that no reasonable juror would have convicted him in light of the new evidence." *Id.* at 326-27.

Michigan Court Rule 6.508 provides that a defendant may not collaterally attack a conviction based upon claims that were decided against him in a prior appeal or that could have been raised in a prior appeal. M.C.R. 6.508(D)(2)-(3). With respect to claims which could have been raised in a prior appeal, a defendant is entitled to relief only if he can establish both "good cause" for failing to assert the issue previously and "actual prejudice" resulting therefrom. M.C.R. 6.508(D)(3). In this context, "actual prejudice" is defined as a "reasonably likely chance of acquittal" or an "irregularity so offensive to the maintenance of a sound judicial process that the conviction should not be allowed to stand." M.C.R. 6.508(D)(3)(a)-(b).

The Sixth Circuit has held that denial of leave to appeal on the basis that a petitioner "failed to meet the burden of establishing entitlement to relief under MCR 6.508(D)," constitutes a sufficient determination that the court's conclusion was based on procedural default. *See Burroughs v. Makowski*, 282 F.3d 410, 414 (6th Cir. 2002). Furthermore, Rule 6.508(D), regularly followed since 1990, constitutes an independent and adequate state ground, the reliance on which precludes federal review of those issues against which it is applied. *Simpson*, 238 F.3d at 407.

Petitioner did not assert the claims in question in his direct appeal as of right, but instead asserted them on post-conviction review. As previously noted, the Michigan Supreme Court rejected Petitioner's request for post-conviction relief on the ground that Petitioner failed to comply with Michigan Court Rule 6.508(D). Accordingly, the Court finds that Petitioner has procedurally

defaulted habeas claims III-V and VII-X, save those claims that *appellate* counsel rendered ineffective assistance. Because Petitioner was represented by counsel throughout the entire direct appeal process, it is not reasonable for appellate counsel to have asserted that she rendered ineffective assistance. As discussed below, however, Petitioner's claims that his appellate counsel rendered ineffective assistance are without merit.

With respect to those claims that Petitioner has procedurally defaulted, he has failed to establish the existence of good cause for failure to properly raise these claims in his direct appeal as of right. While the ineffective assistance of counsel can "supply the cause that, together with prejudice, would excuse a procedural default," *see McFarland v. Yukins*, 356 F.3d 688, 699 (6th Cir. 2004), as discussed below, Petitioner cannot establish that his appellate counsel was ineffective for failing to assert these claims on direct review, as such are without merit.

Petitioner has likewise failed to establish that he will suffer a fundamental miscarriage of justice from the Court's failure to consider these claims. Petitioner has asserted in his habeas petition a claim of actual innocence, but as discussed below, such is without merit. Accordingly, the Court is precluded from reviewing the merits of these procedurally defaulted claims. Moreover, even if Petitioner could overcome his procedural default, the result is the same as these claims are without merit.

A. Ineffective Assistance of Counsel (Habeas Claims III, V, VIII, and X)

In habeas claims III and VIII, Petitioner asserts that his trial counsel was ineffective for failing to question at trial an expert witness. Petitioner further asserts that his appellate attorney was ineffective for failing to assert this claim on appeal. In habeas claims V and X, Petitioner

asserts that his trial counsel and appellate counsel were both ineffective for failing to incorporate certain information in their respective appeals of the decision denying Petitioner's motion to disqualify the trial judge.

To establish that he was denied the right to the effective assistance of counsel, Petitioner must establish that his counsel's performance was so deficient that he was not functioning as the "counsel" guaranteed by the Sixth Amendment. *Strickland v. Washington*, 466 U.S. 668, 687 (1984). Accordingly, Petitioner must demonstrate that his attorney's actions were unreasonable under prevailing professional norms. *Id.* at 688. In assessing such a claim, however, the Court must "indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the [Petitioner] must overcome the presumption that, under the circumstances, the challenged action 'might be considered sound trial strategy.'" *Id.* at 689.

Petitioner must further establish that he suffered prejudice as a result of his attorney's allegedly deficient performance. Prejudice, in this context, has been defined as "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Mahdi v. Bagley*, 522 F.3d 631, 636 (6th Cir. 2008). This is a heavy burden for Petitioner to meet, because he must establish that his counsel's performance was "so manifestly ineffective that defeat was snatched from the hands of probable victory." *Jacobs v. Mohr*, 265 F.3d 407, 418 (6th Cir. 2001).

### 1.    Expert Witness

At the conclusion of the second day of trial, a discussion occurred between the trial judge, Petitioner's counsel, and the prosecutor, concerning Petitioner's desire to offer opinion

testimony from a former police officer on the subject of "service of process." (Trial Transcript, February 4, 2003, 236-51). Specifically, Petitioner sought to elicit testimony that the actions of the police officers on the morning in question were somehow unreasonable. The prosecutor indicated that she would object to any such testimony. After discussing the matter at length with the prosecutor and Petitioner's counsel, the trial judge stated:

> I can't make a decision, based upon what I've heard so far, as to whether or not your expert is going to be allowed to testify, so - and I'm really reluctant to issue an order that's going to restrict, uh, the defense in this case. So you're going to have to bring your expert up, you're going to have to qualify him and so forth. And if there's further objections, then I'll have to entertain them at the time. Right now I'm inclined to let it in, in the limited fashion that we had discussed.

(Tr. 250-51).

Counsel never attempted to question this particular witness. Petitioner asserts that his attorney was ineffective for failing to do so.

Even if the Court assumes that counsel was ineffective for failing to offer testimony from the witness in question, Petitioner cannot demonstrate that he was prejudiced thereby. The record contains no indication as to what testimony this particular witness would have offered. Thus, Petitioner can only speculate that he was prejudiced by his attorney's failure to question this witness. Accordingly, this claim is without merit. Petitioner's claim that his appellate counsel was ineffective for failing to assert this issue on appeal likewise fails, as Petitioner was not prejudiced by counsel's failure to assert a meritless claim.

2.    Motion to Disqualify

As discussed above, Petitioner moved prior to trial to disqualify Judge Pajtas from

presiding over his trial.  Judge Pajtas denied Petitioner's motion.  This decision was subsequently affirmed by a second judge and later the Michigan Court of Appeals.  Petitioner now asserts that his trial attorney and appellate attorney were both ineffective for failing to submit certain information as part of their appeal of Judge Pajtas' decision.  Specifically, Petitioner asserts that his attorneys were ineffective for failing to include the following items: (1) a November 10, 2000 letter from Petitioner to Judge Pajtas; (2) a February 16, 2002 letter from Petitioner to Judge Pajtas; (3) a May 14, 2002 letter from Petitioner to Judge Pajtas; and (4) that Petitioner had identified Judge Pajtas as a potential witness in another matter.

The three letters in question[1] simply express Petitioner's displeasure with Judge Pajtas' rulings in other matters.  The letters contain no evidence that the judge was biased against Petitioner, but instead reveal, as the Michigan Court of Appeals observed, that Petitioner "had a bias against the judge, not that the judge was biased against him."  It is not reasonable to conclude that submission of these letters would have resulted in the reversal of Judge Pajtas' decision denying Petitioner's motion to disqualify.

The Court reaches the same conclusion with respect to the information that Petitioner identified Judge Pajtas as a potential witness in another matter.  Several months prior to Petitioner's trial, proceedings were initiated concerning allegations that Petitioner and Barbara Shulick had neglected and abused their daughter.  (Dkt. #1, Appendix A).  As part of these proceedings, Petitioner expressed the intention to call Judge Pajtas as a witness.  According to an offer of proof filed by Petitioner's attorney, Judge Pajtas was going to testify that the allegations of abuse against Petitioner were "never substantiated."  *Id.*  The Court fails to discern how the assertion that Judge

---

[1]  Copies of these letters are located in Appendix B attached to Shulick's petition for writ of habeas corpus.

Pajtas would provide testimony favorable to Petitioner supports Petitioner's belief that the judge was biased against him.

In sum, even if the Court assumes that Petitioner's trial counsel and appellate counsel were deficient for failing to incorporate the information in question in their efforts to appeal Judge Pajtas' decision denying Petitioner's motion to disqualify, Petitioner has not demonstrated that he was prejudiced thereby. It is not reasonable to conclude that submission of this evidence would have lead to a different result. Accordingly, the Court concludes that this claim - as to both Plaintiff's trial counsel and appellate counsel - is without merit.

### B.    Evidentiary Claims  (Habeas Claims IV, VII, and IX)

### 1.    Attempts to Impeach Sheriff Lasater  (Habeas Claims IV and IX)

Prior to trial, Petitioner advanced a motion to "add witnesses and allow impeachment evidence." (Motion Transcript, January 29, 2003, 23). Specifically, Petitioner sought to "add witnesses" through which he would present extrinsic evidence bearing on Sheriff Lasater's character for truthfulness. (Tr. 23). Petitioner wished to introduce extrinsic evidence that Sheriff Lasater had acted untruthfully in a separate matter involving another individual and which was unconnected to the facts and circumstances giving rise to the charges with which Petitioner was charged. (Tr. 24-32). Petitioner also sought to impeach the Sheriff by exploring a similar line of inquiry on cross-examination. (Tr. 24-32).

Noting that it is improper under Michigan Rule of Evidence 608 to attack (or support) a witness' credibility through extrinsic evidence, the trial judge denied Petitioner's request to add witnesses. (Tr. 30-37). With respect to Petitioner's motion to question the Sheriff on cross-

examination about these extrinsic matters, the trial judge reserved ruling on the ground that such was premature. (Tr. 37-38). Neither the trial judge nor Petitioner appear to have subsequently addressed the matter. Petitioner asserts that the judge's rulings on these matters violated his Sixth Amendment right to cross-examine the witnesses against him, as well as his right to present a defense.

a. Confrontation Clause

The Confrontation Clause of the Sixth Amendment, applied to the states through the Fourteenth Amendment, *see Pointer v. Texas*, 380 U.S. 400, 403-05 (1965), guarantees to every criminal defendant the right "to be confronted with the witnesses against him." *Cruz v. New York*, 481 U.S. 186, 189 (1987). This right entitles the accused to see the witnesses against him face-to-face, and to hear their testimony. *See Dowdell v. United States*, 221 U.S. 325, 329-30 (1911) (adequate confrontation requires that the accused have the opportunity to see the witnesses against him face-to-face at trial).

The Confrontation Clause insures that each witness "will give his statements under oath - thus impressing him with the seriousness of the matter and guarding against the lie by the possibility of a penalty for perjury." *Lee v. Illinois*, 476 U.S. 530, 540 (1986). The Confrontation Clause also permits the jury to observe the witnesses, enabling them to judge by their demeanor on the stand whether they are worthy of belief. *See Mattox v. United States*, 156 U.S. 237, 242-43 (1895). The "main and essential purpose" of the Confrontation Clause, is "to secure for the opponent the opportunity of cross-examination." *Delaware v. Van Arsdall*, 475 U.S. 673, 678 (1986). However, the Confrontation Clause guarantees only "an opportunity for effective cross-examination, not cross-examination that is effective in whatever way, and to whatever extent, the

defense might wish." *Kentucky v. Stincer*, 482 U.S. 730, 739 (1987).

Petitioner was afforded the opportunity to effectively cross-examine Sheriff Lasater. To the extent that Petitioner's efforts to cross-examine the Sheriff were limited, such resulted from the trial judge's application of the Michigan Rules of Evidence. Petitioner has not demonstrated that these particular rules, or their application in this matter, violated his constitutional rights. Accordingly, this claim raises no issue on which habeas relief may be granted.

b.      Right to Present a Defense

The United States Constitution guarantees to criminal defendants "a meaningful opportunity to present a complete defense." *Varner v. Stovall*, 500 F.3d 491, 499 (6th Cir. 2007) (quoting *Crane v. Kentucky*, 476 U.S. 683, 690 (1986)). This right is not without limits, however, and may be reasonably restricted "to accommodate other legitimate interests in the criminal trial process." *United States v. Scheffer*, 523 U.S. 303, 308 (1998); *see also*, *Taylor v. Illinois*, 484 U.S. 400, 412-13 (1988) ("[t]he Sixth Amendment does not confer the right to present testimony free from the legitimate demands of the adversarial system"). For example, as is well recognized, trial judges must make many evidentiary rulings during the course of a trial and "the Constitution leaves to the judges who must make these decisions wide latitude to exclude evidence that is repetitive, only marginally relevant or poses an undue risk of harassment, prejudice, or confusion of the issues." *Gagne v. Booker*, 596 F.3d 335, 340-41 (6th Cir. 2010) (quoting *Crane*, 476 U.S. at 689-90).

Criminal defendants "must comply with established rules of procedure and evidence designed to assure fairness and reliability in the ascertainment of guilt and innocence." *United*

*States v. Cruse*, 59 Fed. Appx. 72, 79 (quoting *Chambers v. Mississippi*, 410 U.S. 284, 302 (1973)). The application of "[s]uch rules do[es] not abridge an accused's right to present a defense so long as they are not arbitrary or disproportionate to the purposes they are designed to serve." *Cruse*, 59 Fed. Appx. at 79-80 (citations omitted). Whether a decision to exclude certain evidence or preclude questioning about a particular matter violates a criminal defendant's constitutional right to present a defense "turns on the extent to which that evidence is so highly relevant that it becomes indispensable to the success of the defense." *Gagne*, 596 F.3d at 341 (quoting *Crane*, 476 U.S. at 691). Against such considerations courts must balance "the state's interests in enforcing the evidentiary rule on which the exclusion was based." *Gagne*, 596 F.3d at 341.

As noted above, the trial judge prevented Petitioner from introducing evidence of unrelated events for the purpose of challenging Sheriff Lasater's character. The trial judge's ruling was premised on Michigan Rule of Evidence 608(b) which provides:

> (b) Specific Instances of Conduct. Specific instances of the conduct of a witness, for the purpose of attacking or supporting the witness' credibility, other than conviction of crime as provided in Rule 609, may not be proved by extrinsic evidence. They may, however, in the discretion of the court, if probative of truthfulness or untruthfulness, be inquired into on cross-examination of the witness (1) concerning the witness' character for truthfulness or untruthfulness, or (2) concerning the character for truthfulness or untruthfulness of another witness as to which character the witness being cross-examined has testified.[2]

The extrinsic evidence Petitioner sought to introduce was at most only marginally relevant and was certainly not indispensable to the success of his defense. On the other hand,

---

[2] This provision is identical to Federal Rule of Evidence 608(b).

Federal Rule of Evidence 608(b), and by extension Michigan Rule of Evidence 608(b), is neither arbitrary nor disproportionate. *See Cruse*, 59 Fed. Appx. at 80. In sum, the trial judge's decision to limit Petitioner's defense in this manner was consistent with Rule 608 and did not violate Petitioner's constitutional rights. Accordingly, this claim is without merit.

2. Post-Conviction Evidentiary Claim[3] (Habeas Claim VII)

As noted above, after unsuccessfully challenging his convictions on direct appeal, Petitioner filed in the trial court a post-conviction motion for relief from judgment. Petitioner asserted, in part, that Barbara Shulick was forced or coerced to testify untruthfully at Petitioner's trial. In support of its position that Barbara Shulick's recantation was unworthy of belief, the prosecution submitted the transcript of an interview that occurred on or about September 23, 2002, between a Charlevoix County Sheriff's Deputy and one of Barbara Shulick's friends. Petitioner asserts that consideration of such hearsay evidence violated his constitutional rights. Petitioner's claim is not cognizable, however, as "errors in post-conviction proceedings are outside the scope of federal habeas corpus review." *See, e.g., Cress v. Palmer*, 484 F.3d 844, 853 (6th Cir. 2007).

III. **Unexhausted Claims** (Habeas Claims II and VI)

A petition for writ of habeas corpus "shall not be granted" unless "the applicant has exhausted the remedies available in the courts of the State." 28 U.S.C. § 2254(b)(1)(A). The exhaustion requirement "is satisfied when the highest court in the state in which the petitioner was

---

[3] The material forming the background for this particular claim is located in Appendix B to Shulick's petition for writ of habeas corpus. (Dkt. #1).

convicted has been given a full and fair opportunity to rule on the petitioner's claims." *Jells v. Mitchell*, 538 F.3d 478, 488 (6th Cir. 2008) (citation omitted). Claims II and VI in Shulick's petition for writ of habeas corpus have not been properly exhausted.

Furthermore, Petitioner is unable to return to state court and exhaust these issues by filing a motion for relief from judgment. Michigan court rules provide that a defendant can file only one such motion, *see* M.C.R. 6.502(G)(1), and Petitioner has already filed his.[4] When a petitioner has failed to properly exhaust a particular claim, and there exists no available remedy by which such failure can be corrected, the Court must determine whether there exists cause and prejudice to excuse his failure to present the claim in state court. *See Gray v. Netherland*, 518 U.S. 152, 161-62 (1996); *Rust v. Zent*, 17 F.3d 155, 160 (6th Cir. 1994). Petitioner has failed to demonstrate that there exists cause or prejudice for his failure to properly exhaust the claims in question. The Court is, therefore, precluded from addressing the merits of these claims. Even if Petitioner could make such a showing, however, the result is the same as these claims are without merit.

### A.    Factual Innocence  (Habeas Claim II)

---

[4]   The Court notes that Michigan Court Rule 6.508(D)(3) appears to indicate that Petitioner *may*, in fact, be entitled to bring a second motion for relief from judgment upon a showing of cause and prejudice. Assuming this interpretation is accurate, the determination whether Petitioner can satisfy the requirements of a particular Michigan court rule seems to be a matter for the courts of the State of Michigan to decide. *See, e.g., Lukity v. Elo*, 2000 WL 1769507 at *4 (E.D.Mich., Oct. 10, 2000) ("[g]iven the inability to conclude that there is an absence of available state corrective procedures, the principles of federal-state comity dictated by the exhaustion doctrine compel this Court to defer to the State of Michigan to interpret its own postconviction statute"). The Court notes, however, that this is an approach with which the Sixth Circuit disagrees. *See Dorch v. Smith*, 105 Fed. Appx. 650 (6th Cir., June 25, 2004) (finding that petitioner was unable to file a second motion for relief from judgment pursuant to M.C.R. 6.502(G)); *Paffhousen v. Grayson*, 2000 WL 1888659 (6th Cir., Dec. 19, 2000) (same); *Bostic v. Abramajtys*, 1999 WL 96738 (6th Cir., Feb. 3, 1999) (same). The Court need not attempt to resolve this dispute, however, because as discussed below the unexhausted claims asserted in Shulick's petition are without merit. Thus, even if it were determined that Petitioner could pursue a second post-conviction motion, the Court would recommend in the alternative that the unexhausted claims at issue be denied as meritless. *See* 28 U.S.C. § 2254(b)(2) (indicating that "[a]n application for a writ of habeas corpus may be denied on the merits, notwithstanding the failure of the applicant to exhaust the remedies available in the courts of the State").

Petitioner asserts that he is entitled to habeas relief because he is actually innocent of the crimes for which he was convicted. Petitioner asserts that his innocence is established by the "recantation affidavit" executed by Barbara Shulick. In this particular affidavit, Barbara Shulick asserted that she was "pressured" by numerous people to "testify falsely" against Petitioner. (Dkt. #1, Appendix B). This claim is without merit.

In *Herrera v. Collins*, 506 U.S. 390 (1993), the Court observed that "[c]laims of actual innocence based on newly discovered evidence have never been held to state a ground for federal habeas relief absent an independent constitutional violation occurring in the underlying state criminal proceeding." *Id.* at 400, *see also*, *Cress v. Palmer*, 484 F.3d 844, 854 (6th Cir. 2007) ("The Supreme Court has held that newly discovered evidence does not constitute a freestanding ground for federal habeas relief but, rather, that the newly discovered evidence can only be reviewed as it relates to an 'independent constitutional violation occurring in the underlying state criminal proceeding.'") (citations omitted). As the *Herrera* Court stated, "[t]his rule is grounded in the principle that federal habeas courts sit to ensure that individuals are not imprisoned in violation of the Constitution - not to correct errors of fact." *Herrera*, 506 U.S. at 400.

As discussed herein, Petitioner has failed to identify any error of federal or constitutional law that occurred during his trial or that has resulted from his conviction and imprisonment. Accordingly, this particular claim is not cognizable and affords Petitioner no relief. Furthermore, even if the Court could consider Petitioner's claim of actual innocence, such is unpersuasive. As the trial judge concluded, in denying Petitioner's post-conviction motion for relief

from judgment, Barbara Shulick's affidavit, executed under "questionable circumstances"[5] almost three years after Petitioner's trial, was unpersuasive. The trial judge further observed that Barbara Shulick's trial testimony was consistent with the other evidence presented at Petitioner's trial. Finally, as the trial judge further observed, Barbara Shulick's "testimony [was] not the only testimony that convicted the defendant." Accordingly, this particular claim affords Petitioner no relief.

B.     Challenge to Constitutionality of State Statute[6]  (Habeas Claim VI)

In his post-conviction motion for relief from judgment, Petitioner argued, in part, that Barbara Shulick had been coerced by, among others, Mark Muniak, to testify untruthfully at Petitioner's criminal trial. By the time Petitioner advanced this argument, Muniak was employed by the Charlevoix County Prosecutor's Office. Finding that such presented an "apparent conflict with one of [his] staff," the Charlevoix County Prosecutor "requested that the Attorney General appoint a Special Prosecutor" to respond to Petitioner's motion. Relying on Michigan law, the Attorney General subsequently appointed the Antrim County Prosecutor to "perform all the duties of prosecuting attorney" in Petitioner's case. Petitioner now asserts that the appointment of the Special Prosecutor violated his constitutional rights. As previously noted, however, "errors in post-conviction proceedings are outside the scope of federal habeas corpus review." *See Cress*, 484 F.3d at 853. Accordingly, this claim is not cognizable and can afford Petitioner no relief.

---

[5]  For example, the judge observed that Barbara Shulick executed her affidavit only after she remarried Petitioner in July 2006.

[6]  The material forming the background for this particular claim is located in Appendix B to Shulick's petition for writ of habeas corpus. (Dkt. #1).

## **CONCLUSION**

For the reasons articulated herein, the undersigned concludes that Petitioner is not being confined in violation of the laws, Constitution, or treaties of the United States. Accordingly, the undersigned recommends that Shulick's petition for writ of habeas corpus be **denied**. The undersigned further recommends that a certificate of appealability be denied. *See Slack v. McDaniel*, 529 U.S. 473 (2000).

OBJECTIONS to this Report and Recommendation must be filed with the Clerk of Court within 14 days of the date of service of this notice. 28 U.S.C. § 636(b)(1)(C). Failure to file objections within the specified time waives the right to appeal the District Court's order. *Thomas v. Arn*, 474 U.S. 140 (1985); *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981).

Respectfully submitted,


Date: June 23, 2010                              /s/ Ellen S. Carmody
                                                 ELLEN S. CARMODY
                                                 United States Magistrate Judge